Gary James DAVIS, Petitioner,

v.

M.L.G. CORPORATION, d/b/a American International Rent-A-Car,
Respondent.

No. 83SC219.

Supreme Court of Colorado,
En Banc.

Jan. 21, 1986.

DeMoulin, Anderson, Campbell & Laugesen, P.C., Laird Campbell and Thomas M. Schrant, Denver, for petitioner.

Rothgerber, Appel, Powers & Johnson, James R. Everson and Frederick J. Baumann, and Holland & Hart, William C. McClearn and John S. Castellano, Denver, for respondent.

Burns & Figa, P.C., Hugh A. Burns and Phillip S. Figa, Denver, for amicus curiae American Rental Ass'n.

Keller, Dunievitz, Johnson & Wahlberg, Stephen W. Wahlberg, Denver, for amicus curiae Truck Renting and Leasing Ass'n.

NEIGHBORS, Justice.

We granted certiorari in *M.L.G. Corp. v. Davis*, 672 P.2d 1019 (Colo.App.1983), to review the court of appeals' decision that a

"physical damage waiver" in a car rental agreement was not an insurance contract, and that the waiver provision was voided when the customer violated a provision in the contract prohibiting driving while intoxicated. We announced our original opinion on May 6, 1985. We held that the "physical damage waiver" is a contract of insurance under the Colorado Auto Accident Reparations Act, §§ 10–4–701 to –723, 4 C.R.S. (1973 & 1985 Supp.). Thereafter, we granted the respondent's petition for rehearing. The case was then re-briefed and re-argued. The original opinion is now withdrawn and is of no precedential value.

We conclude that the car rental agency limited the scope of the physical damage waiver in an unconscionable manner. Accordingly, the judgment of the court of appeals is reversed and the case is remanded to that court with directions to affirm the trial court's judgment. Since our decision is based on contract principles, we leave for another day the question of whether a physical damage waiver such as that present in this case constitutes "insurance" within the meaning of the Colorado Auto Accident Reparations Act.

## I.

M.L.G. Corporation (MLG), doing business as American International Rent-A-Car, brought suit against Gary Davis to recover damages, attorney's fees, costs and interest which resulted from Davis' alleged breach of a car rental agreement between the parties. The pertinent facts which prompted the litigation are not in dispute.

Davis rented a car from MLG on June 26, 1980. MLG's standard rental agreement consisted of several thin, identical pages separated by sheets of carbon paper. On the face of the agreement, denominated as "page 2," space was provided to enter information concerning the customer, the method of payment, the vehicle rented, and the rental rate.

One factor which determined the rental rate was the "collision responsibility" of the customer. Lessees were asked to select one of three collision responsibility al-

ternatives: $500 physical damage responsibility, $350 physical damage responsibility, or physical damage waiver. Davis initialed the "physical damage waiver" option, for which he was charged an additional $4 per day for the rental of the car. The rental rate was also dependent upon whether a lessee accepted or declined "personal accident insurance." Davis initialed the "declines" alternative, which was located directly below the physical damage waiver provision on the rental form.

The reverse side of the rental agreement, labeled as "page 1," consisted of twelve numbered paragraphs set out in small, light grey type on white paper. The following language applicable to the waiver provision is contained in paragraph 5:

5. PROVIDING THERE IS NO VIOLATION BY CUSTOMER OF ANY OF THE PROVISION[S] OF THIS AGREEMENT, AND NOT OTHERWISE, Customer's responsibility for damages to Vehicle (except theft of Vehicle if keys left in Vehicle or loss or theft of tires, tools or accessories) shall be limited to:

. . . .

c) Waived if Customer has at the time of rental initialed the box entitled "Physical Damage Waiver (PDW)," and agreed to pay Lessor the additional specified fee.

NOTE: PHYSICAL DAMAGE WAIVER IS NOT INSURANCE

If Customer permits the use of Vehicle by persons other than Customer or other authorized operators, as described herein or uses or permits use of the Vehicle in violation of Paragraph 3 hereof or if Customer uses Vehicle off a paved road or in a reckless, abusive or wanton manner, Customer shall be liable for all damage to Vehicle, regardless of whether Customer has accepted Physical Damage Waiver.

Paragraph 3 sets out thirteen prohibitions concerning the use of the rental car. That provision states, in part:

3. Vehicle shall NOT be used, operated or driven under any circumstances for the following purposes or under the fol-

lowing conditions and if so used, such use shall be WITHOUT LESSOR'S PERMISSION:

. . . .

e) By any person under the influence of drugs or intoxicants.[1]

On June 27, 1980, Davis was involved in a single car collision in which he struck a utility pole. At trial, Davis stipulated that he was intoxicated at the time of the accident.

▪ MLG sought to recover the following contractual damages: The value of the 1980 Ford Pinto that was totally demolished in the accident in the amount of $6,100; the sum of $568.42 which MLG paid to Public Service Company to compensate it for the damage that Davis caused to the company's utility pole;[2] towing and appraisal charges of $154; attorney's fees; and costs and interest. In its complaint, MLG alleged that Davis breached the provision in the rental agreement requiring him to return the car to the agency in the "same condition as received, ordinary wear and tear excepted." Davis raised the physical damage waiver as a defense to MLG's claim. MLG argued that the waiver Davis

purchased was conditioned on his adherence to all of the provisions of the rental agreement, including paragraph 3(e).

The trial court dismissed MLG's complaint, finding that the rental agreement was a contract for insurance which should be construed against MLG as the insurer because it was ambiguous, unconscionable, and contrary to public policy. The court held that by conditioning its collision protection on factors such as sobriety, MLG had attempted to inject a fault element into its insurance coverage, which is contrary to public policy as expressed in the Colorado Auto Accident Reparations Act, §§ 10-4-701 to -723, 4 C.R.S. (1973 & 1985 Supp.), commonly known as the No-Fault Act.

The court of appeals reversed and held that the rental agreement was not a contract for insurance, but rather a bailment contract for the parties' mutual benefit which was neither ambiguous nor unconscionable. The court of appeals remanded the case to the trial court with directions to enter judgment for MLG.

## II.

▪ Leasing a vehicle from a car rental agency creates a bailment contract for

1. Among the other prohibitions on the use of the leased vehicle set forth in paragraph 3 is a clause which is similar to those which have been construed in other cases:

    f) In violation of any federal, state or municipal law, ordinance, rule or regulation governing the use, operation or return thereof.

2. Paragraph 6 of the rental agreement provides:

    6. Customer is covered by an automobile liability insurance policy, with limits of liability for bodily injury, including death, equal to the statutory limits prescribed under the Financial Responsibility Law or other applicable statute of the state in which the Vehicle is rented.... Coverage hereunder shall automatically conform to the requirements of any "No Fault" law which may be applicable. In the event that coverage is imposed, by operation of law, to the benefit of any person other than the Customer or any Authorized Operator described herein, then the limits of such coverage shall be the minimum requirements of the Financial Responsibility Law or other applicable statute of the state or other jurisdiction in which the accident occurred [sic].... SUCH INSURANCE COVERAGE SHALL BE NULL AND VOID IF CUSTOMER VIOLATES ANY OF THE PROVISIONS OF

THIS AGREEMENT and under such conditions, if a claim for personal injury or property damage is asserted, Customer indemnifies and holds Lessor and its insurance carrier harmless of and from any and all damages, loss, cost, and expense which Lessor or its insurance carrier or both shall sustain, including attorney's fees.

The trial court dismissed the action against Davis without referring to paragraph 6 or analyzing the claim to recover the money paid for damage to the utility pole. Because this claim involves property damage rather than damage to the leased vehicle, it should have been brought pursuant to paragraph 6. The court of appeals also did not address the issue in reversing the trial court's judgment. We note, however, that by conditioning its compulsory liability coverage for property damage on compliance with the provisions of the agreement, MLG has impermissibly attempted to limit the statutory requirements of section 10-4-706(1), 4 C.R.S. (1973 & 1985 Supp.). *Meyer v. State Farm Mutual Automobile Ins. Co.*, 689 P.2d 585, 589 (Colo.1984). *See also Universal Indemnity Ins. Co. v. Tenery*, 96 Colo. 10, 39 P.2d 776 (1934).

the mutual benefit of the parties. *See generally Universal Indemnity Insurance Co. v. Tenery*, 96 Colo. 10, 39 P.2d 776 (1934); 14 *Blashfield Automobile Law and Practice* § 475.13 (F. Lewis 3d ed. 1969). The general rule is that the bailee/lessee is liable to the bailor/lessor for any damage to the loaned vehicle caused by the bailee/lessee's fault or negligence. 14 *Blashfield Automobile Law and Practice* § 476.21 (F. Lewis 3d ed. 1969); *see also Christensen v. Hoover*, 643 P.2d 525 (Colo. 1982). However, the parties are free to alter their common law obligations by contract, provided their agreement does not contravene public policy or violate a statute. *See, e.g., O'Connor v. Proprietors Insurance Co.*, 696 P.2d 282 (Colo.1985) (parties to an insurance contract may agree to exclude certain risks, unless the provisions limiting coverage violate public policy); *Allied Van Lines, Inc. v. Smith*, 28 Colo.App. 85, 470 P.2d 926 (1970) (the Carmack Amendment to the Interstate Commerce Act codified the common law rules of carrier liability; any contract provisions purporting to limit those rules are void).

MLG contends that because the car rental agreement, particularly the provisions concerning collision responsibility, altered the parties' common law liability, the agreement should govern their relationship. Specifically, MLG maintains that the contract is neither ambiguous nor unconscionable and thus should be enforced as written.

### A.

A number of courts have construed vehicle leasing agreements containing provisions which are virtually identical to the physical damage waiver (more commonly known as a collision damage waiver) in the automobile rental agreement at issue here in connection with provisions limiting that coverage. *PaR Truck Leasing, Inc. v. Bonanza, Inc.*, 425 F.2d 695 (10th Cir.1970); *National Car Rental System, Inc. v. Council Wholesale Distributors, Inc.*, 393 F.Supp. 1128 (M.D.Ga.1974); *Red Top Drive-Ur Self Co. v. Munger*, 229 Ark. 998, 320 S.W.2d 97 (1959); *Automobile Leasing & Rental, Inc. v. Thomas*, 679 P.2d 1269 (Nev.1984); *Union County U-Drive It v. Blomeley*, 46 N.J.Super. 92, 133 A.2d 714 (Ct.Law Div.1957), *aff'd*, 48 N.J.Super. 252, 137 A.2d 428 (Ct.App.Div.1958); *Elliott Leases Cars, Inc. v. Quigley*, 118 R.I. 321, 373 A.2d 810 (1977). In most of these cases courts have given effect to the collision damage waiver; disregarded the attempted exclusions; and held the lessor, rather than the lessee, financially responsible for damage to the rented automobile. *Bonanza*, 425 F.2d 695; *National*, 393 F.Supp. 1128; *Thomas*, 679 P.2d 1269; *Blomeley*, 137 A.2d 428; *Quigley*, 373 A.2d 810. A number of the appellate courts reached this result by identifying an ambiguity of doubtful legal significance,[3] apply-

---

**3.** For example, in *National Car Rental System, Inc. v. Council Wholesale Distributors, Inc.*, 393 F.Supp. 1128 (M.D.Ga.1974), the United States District Court for the Middle District of Georgia ruled, contrary to National's contention, that National did not intend the words "used," "operated" and "driven" to be used interchangeably. It then found that the use of the word "operated" in the exclusion clause of the collision damage waiver provision of a truck lease could reasonably lead a lessee to believe that the exclusions from coverage embodied only those sections of the agreement which restricted a lessee's *operation* of the leased vehicle and not those sections which restricted the *use* or *driving* of the vehicle. *Id.* at 1138. National had relied on a use restriction in arguing that the lessee fell within the exclusion from collision coverage. The court held that the lessee did not become liable under the collision damage waiv-

er clause since only operational restriction violations could have that effect. *Id.* To similar effect, see *Union County U-Drive It v. Blomeley*, 46 N.J.Super. 92, 133 A.2d 714 (Ct.Law Div. 1957).

Likewise, the Rhode Island Supreme Court in *Elliott Leases Cars, Inc. v. Quigley*, 118 R.I. 321, 373 A.2d 810 (1977), noted that an automobile lease agreement clearly and unequivocally purported to exclude from collision coverage damage to the car resulting from violations of the conditions of the agreement or from negligent handling of the vehicle. The court nevertheless found a conflict, on the basis that a prominent provision of the contract was explicitly "contradicted" by an admittedly unequivocal provision contained in the fine print of a less apparent provision. *Id.* 373 A.2d at 813. Applying the rule of construction that ambiguous provisions will be construed against the author, the court

ing the rule that an ambiguity should be resolved against the drafter of the agreement, and then interpreting the questionable ambiguity contrary to the plainly expressed terms of the contract document. *National*, 393 F.Supp. 1128; *Blomeley*, 137 A.2d 428; *Quigley*, 373 A.2d 810.

One court arrived at a similar outcome without resorting to the ambiguity analysis. In *Thomas*, 679 P.2d 1269, the Nevada Supreme Court addressed the enforceability of a limitation on a collision damage waiver provision. The rental car agency argued that the collision coverage was not operative because the lessee had violated the lease agreement's prohibition against using the vehicle in an unlawful manner, as evidenced by his receipt of a citation for making a left turn from an improper position. *Id.* at 1270. The court concluded that the purported limitation on collision coverage was neither apparent from the face of the rental agreement nor from a simple reading of the reverse side. *Id.* at 1270–71. Thus, an ordinary reader of the waiver provision would be misled into believing that his liability for collision damage was waived by the rental agency in virtually all cases. *Id.* at 1271. Because the renter was not adequately informed of the limitations on collision coverage, the court refused to enforce them.

■ While the result in *Thomas* is reached by an analysis which differs from that relied on by other courts, the decisions nevertheless reflect a common thread. In cases in which a lease agreement is not ambiguous in the sense that the instrument is subject to two possible interpretations, the courts' opinions reflect a proper concern with the deceptive character of language which leads an average renter to believe that he or she has paid for broad protection against collision liability. *See Morgan v. State Farm Life Insurance Co.*, 240 Or. 113, 400 P.2d 223, 225 (Or. 1965) (O'Connell, J., dissenting). Generally, therefore, courts have refused to give effect to exclusions from coverage which are not apparent to the ordinary lessee. Regardless of the legal framework invoked to nullify exclusions from coverage in such cases, the broader public policy underlying the result is the same—that of honoring reasonable expectations. Keeton, *Insurance Law Rights at Variance with Policy Provisions*, 83 Harv.L.Rev. 961, 967 (1970).[4]

A review of the vehicle leasing cases decided on the ground of ambiguity supports the proposition that courts are desirous of upholding a lessee's reasonable understanding of the scope of a rental agreement's collision damage waiver provision. For instance, in *Blomeley*, the Superior Court of New Jersey stated:

> [I]t is fairly and reasonably to be supposed that the ... limitation of the renter's liability was intended to be applicable within the broad range of the normally expectable and foreseeable use of the vehicle by the renter—in other words, to be the rule rather than the exception.

137 A.2d at 430.

The court in *Quigley* relied upon the analysis in cases involving true insurance contracts in evaluating the validity of the collision responsibility provisions in an automobile leasing agreement.[5] It articulated the general rules of construction to be applied in such cases, stating:

> If there remains any doubt, the terms should be read in the sense which the insurer had reason to believe they would be interpreted by the ordinary reader and purchaser. The test to be applied is not what the insurer intended by his words, but what the ordinary reader and purchaser would have understood them to mean.

interpreted the contract so as to give effect to the collision coverage clause while disregarding the attempted exclusion. *Id.* 373 A.2d at 813–14.

**4.** This article concerns true insurance contracts rather than damage waiver provisions of the type at issue in this case. However, because the agreement in this case was, like most insurance contracts, a "form" contract prepared by the lessor and offered on a take-it-or-leave-it basis, "we feel that the appropriate interpretive principles are those normally applicable to insurance contracts." *Elliott Leases Cars, Inc. v. Quigley*, 118 R.I. 321, 373 A.2d 810, 812 (1977).

**5.** *See supra* note 4.

373 A.2d at 812. The court then examined the language of the collision responsibility clause in light of these principles:

> The ordinary reader would not assume that an unqualified promise of this nature only covered accidents not caused by the negligence of the operator of the automobile. Indeed just the opposite is true. Collision insurance is generally understood to cover whatever accidents occur, regardless of the [fault] of the operator.

*Id.* When the provision was further considered with reference to the context in which it appeared, the court held that:

> The ordinary reader ... would be warranted in concluding that any significant limitation on collision insurance would have been explicitly noted.

*Id.* To similar effect, see *National*, 393 F.Supp. 1128.[6]

### B.

We are persuaded that the analysis in *Thomas* represents the more principled basis to use in resolving the enforceability of clauses in automobile rental agreements which limit the scope of collision or physical damage waivers. We recognize that this approach fails to give effect to some hornbook rules governing the construction of contracts.[7] On the other hand, an approach which strives to uphold reasonable expectations is consistent with numerous other interpretive rules pertaining to contracts. Words are given effect according to their ordinary or popular meaning. *Resort Car Rental System, Inc. v. Chuck Ruwart Chevrolet, Inc.*, 519 F.2d 317 (10th Cir.1975); *Buckley Brothers Motors, Inc. v. Gran Prix Imports, Inc.*, 633 P.2d 1081 (Colo.1981). The scope of the agreement is not determined in a vacuum, but instead with reference to extrinsic circumstances. *Lorenzen v. Mustard's Last Stand, Inc.*, 196 Colo. 265, 586 P.2d 12 (1978). The interpretation which makes a contract fair and reasonable is selected over that which yields a harsh or unreasonable result. *M.R. Mansfield Realty, Inc. v. Sunshine*, 38 Colo.App. 334, 561 P.2d 342 (1976), *aff'd,*

---

**6.** The principle of honoring reasonable expectations is also evidenced in many true insurance cases. *See, e.g.,* the often quoted opinion by Judge Learned Hand in *Gaunt v. John Hancock Mutual Life Ins. Co.*, 160 F.2d 599, 601 (2d Cir.), *cert. denied,* 331 U.S. 849, 67 S.Ct. 1736, 91 L.Ed. 1858 (1947):

> An underwriter might so understand the phrase, when read in its context, but the application was not to be submitted to underwriters; it was to go to persons utterly unacquainted with the niceties of life insurance, who would read it colloquially. It is the understanding of such persons that counts; and not one in a hundred would suppose that he would be covered, not "as of the date of completion of Part B," as the defendant promised, but only as of the date of approval.

*See also Steven v. Fidelity & Casualty Co.*, 58 Cal.2d 862, 27 Cal.Rptr. 172, 377 P.2d 284 (1962) (the question of ambiguity of the policy language is to be determined in view of the insured's "knowledge and understanding as a reasonable layman, his normal expectation of the extent of coverage of the policy ..."); *Kievit v. Loyal Protective Life Ins. Co.*, 34 N.J. 475, 170 A.2d 22 (1961) ("[w]hen members of the public purchase policies of insurance they are entitled to the broad measure of protection necessary to fulfill their reasonable expectations"); *Allen v. Metropolitan Life Ins. Co.*, 44 N.J. 294, 208 A.2d

638 (1965) ("reasonable expectations in the transaction may not justly be frustrated and courts have properly molded their governing interpretative principles with that uppermost in mind"). *See generally* Keeton, *Insurance Law Rights at Variance with Policy Provisions*, 83 Harv.L.Rev. 961 (1970). In Colorado, see *Newton v. Nationwide Mutual Fire Ins. Co.*, 197 Colo. 462, 594 P.2d 1042 (1979) (public policy favors protecting consumers by requiring those who sell insurance to disclose fully and fairly to the purchasing public what insurance protection is actually being provided for the premium charged).

**7.** Thus, the tenet that a party is presumed to know the content of a contract signed by him, *Cordillera Corp. v. Heard*, 41 Colo.App. 537, 592 P.2d 12 (1978), *aff'd,* 200 Colo. 72, 612 P.2d 92 (1980), the precept that contracts which are free from ambiguity are to be enforced as written, *Radiology Professional Corp. v. Trinidad Area Health Ass'n, Inc.*, 195 Colo. 253, 577 P.2d 748 (1978); *Jameson v. Foster*, 646 P.2d 955 (Colo. App.1982), and the maxim that specific clauses control the effect of general clauses, *Denver Joint Stock Land Bank v. Markham*, 106 Colo. 509, 107 P.2d 313 (1940); *see Noyes Supervision, Inc. v. Canadian Indemnity Co.*, 487 F.Supp. 433 (D.Colo.1980), will, in many cases, be inapplicable.

195 Colo. 95, 575 P.2d 847 (1978). Finally, the central policy underlying contract law, that of construing contracts so as to effectuate the parties' intentions, *e.g., Pirkey v. Hospital Corporation of America*, 483 F.Supp. 770 (D.Colo.1980); *Griffin v. United Bank of Denver*, 198 Colo. 239, 599 P.2d 866 (1979), is heeded.

Moreover, the *Thomas* analysis is buttressed by its consonance with the doctrine of unconscionability. In order to support a finding of unconscionability, there must be evidence of some overreaching on the part of one of the parties such as that which results from an inequality of bargaining power or under other circumstances in which there is an absence of meaningful choice on the part of one of the parties, together with contract terms which are unreasonably favorable to that party. *McMillion v. McMillion*, 522 P.2d 125 (Colo.App. 1974).

Factors which have been found relevant to the unconscionability determination include: a standardized agreement executed by parties of unequal bargaining strength, *Steven v. Fidelity & Casualty Co.*, 58 Cal.2d 862, 27 Cal.Rptr. 172, 377 P.2d 284 (1962); *A & M Produce Co. v. FMC Corp.*, 135 Cal.App.3d 473, 186 Cal.Rptr. 114 (1982); *Steinhardt v. Rudolph*, 422 So.2d 884 (Fla.App.1982); lack of opportunity to read or become familiar with the document before signing it, *Williams v. Walker-Thomas Furniture Co.*, 350 F.2d 445 (D.C. Cir.1965); *Steven*, 377 P.2d at 294–95; *Steinhardt*, 422 So.2d at 892; use of fine print in the portion of the contract containing the provision, *Williams*, 350 F.2d at 449; *A & M Produce*, 186 Cal.Rptr. at 122; *C & J Fertilizer, Inc. v. Allied Mutual Insurance Co.*, 227 N.W.2d 169 (Iowa 1975); absence of evidence that the provision was commercially reasonable or should reasonably have been anticipated, *C & J Fertilizer*, 227 N.W.2d at 181; *see A & M Produce*, 186 Cal.Rptr. at 123; the terms of the contract, including substantive unfairness, *Williams*, 350 F.2d at 449–50; *C & J Fertilizer*, 227 N.W.2d at 181; *see Steinhardt*, 422 So.2d at 893–94; the relationship of the parties, including factors of assent, unfair surprise and notice, *C & J Fertilizer*, 227 N.W.2d at 181; *see A & M Produce*, 186 Cal.Rptr. at 122; and all the circumstances surrounding the formation of the contract, including its commercial setting, purpose and effect, *Williams*, 350 F.2d at 450; *A & M Produce*, 186 Cal.Rptr. at 123; *C & J Fertilizer*, 227 N.W.2d at 181. *See generally* Annot., 86 A.L.R.3d 862 (1972); Annot., 18 A.L.R.3d 1305 (1968); 2 *Restatement (Second) of Contracts* § 208 (1981).[8]

When these factors are examined in conjunction with the circumstances surrounding the rental of a car and the selection of a damage waiver option, there can be little doubt that the courts which decline to enforce the limitations on such coverage in a vehicle leasing agreement are, in effect, using an analytical framework analogous

---

**8.** These factors have been applied to support a finding of unconscionability in a number of cases. Thus, in *Steven v. Fidelity & Casualty Co.*, 58 Cal.2d 862, 27 Cal.Rptr. 172, 377 P.2d 284 (1962), the court declared that literal application of the substitute transportation provision of an airplane trip insurance policy tended to be harsh and unconscionable. The court based its holding on the following facts: The liability limitation was contained in a standardized contract, the method of sale did not permit the purchaser to read the policy prior to its issuance, and the provision did not plainly or clearly provide for noncoverage under the circumstances of the case.

Similarly, in *C & J Fertilizer, Inc. v. Allied Mutual Ins. Co.*, 227 N.W.2d 169 (Iowa 1975), the court held unconscionable a provision in two mercantile insurance policies which limited the insurer's liability by defining "burglary" to require "visible marks" on, or "physical damage" to, the exterior of the premises at the place of entry. The court relied on the small size of the print and the insurer's failure to offer any evidence that the provision defining "burglary," considered in its commercial setting, was a reasonable limitation on the protection offered or should reasonably have been anticipated by the insured.

Finally, in *Blakeslee v. Farm Bureau Mutual Ins. Co.*, 388 Mich. 464, 201 N.W.2d 786 (1972), the court found it unconscionable to permit an insurance company offering statutorily mandated uninsured motorist coverage to collect a premium for the coverage while simultaneously limiting the coverage by means of an "other insurance" limitation.

to the doctrine of unconscionability. Those circumstances are described in *Quigley*, 373 A.2d at 813–14: Lessees enter into agreements contained in "form" contracts drafted entirely by the lessor. While the general collision damage waiver provision appears prominently on the face of the agreement, the specific provision limiting that coverage is buried in fine print elsewhere in the document. It is common knowledge that the detailed provisions of standardized contracts are seldom read by consumers. In short, lessors should know that the simple, highly readable summary of the collision responsibility alternatives will lead an average customer to reasonably conclude that he is protected against most, if not all, risks.

### III.

We now turn to the facts of this case and evaluate them in light of the principles previously articulated.

At trial, the rental agent who executed the agreement with Davis on behalf of MLG testified that the contract was offered on a take-it-or-leave-it basis. She also stated that if a customer selected the physical damage waiver alternative, she would explain to the customer that he was not liable for any physical damage to the car. She testified further that it was her customary and usual practice to describe the physical damage waiver as insurance. The reasonableness of this characterization of that clause is reinforced by its proximity to the rental form's personal accident *insurance* provision.

Additionally, the trial court made the following pertinent findings: (1) It was Davis' intention in paying for the property damage waiver to relieve himself of collision damage responsibility. (2) A "normal" person renting a car and signing this kind of agreement would be led to believe that by paying an extra $4 per day he would be "covered" in the event of a collision, regardless of whether he was under the influence of alcohol. (3) MLG's rental agent had never observed any of her customers read the reverse side (page 1) of the agreement. (4) The exceptions to the physical damage waiver were never brought to Davis' attention although certain other clauses on the front of the document, such as that referring to the customer's responsibility for parking and traffic violations, were. (5) The combination of the color and size of the print "almost makes it impossible" to read the back of the agreement. (6) By using the type of form it did, with its "off-color," small print and its atypical pagination, MLG made a "concerted effort" to discourage persons from reading the back of the form.

■ We conclude that the physical damage waiver contained in the rental agreement entered into between Davis and MLG was significantly restricted in an unconscionable manner.

Accordingly, the judgment of the court of appeals is reversed and the case is remanded with directions to affirm the trial court's judgment.

LOHR, J., specially concurs.

ROVIRA, J., joins in the special concurrence.

KIRSHBAUM, J., does not participate.

LOHR, Justice, specially concurring:

I concur in the result reached by the majority, but write separately to emphasize what I understand to be the limited applicability of the unconscionability/reasonable expectations doctrine announced in the majority opinion.

The facts here establish that M.L.G. had attempted to limit the applicability of the physical damage waiver while purposefully and successfully attempting to prevent its customer Davis from learning of that limitation. An examination of the rental agreement signed by Davis demonstrates that the trial court's finding that the reverse side is almost impossible to read because of the color and size of print is not hyperbole. The trial court found that the design of the form established a "concerted effort" by M.L.G. to discourage persons from reading the back of the form. The rental agent testified that if a customer

selected the physical damage waiver alternative, the agent would explain that the customer was not liable for physical damage to the car. The agent had never observed any of her customers reading the reverse side of the agreement. The exceptions to the physical damage waiver were not called to Davis' attention, although certain other contractual provisions were pointed out to him specifically. Under these circumstances, I agree that it would be unconscionable to enforce the exceptions to the physical damage waiver provision printed on the reverse side of the rental agreement against Davis.

I express no opinion, however, as to the extent to which the doctrines concerning either unconscionability or the reasonable expectations of the contract parties, relied upon by the majority, can be or should be applied to resolve other contract disputes, including other disputes involving consumer contracts. Certainly, these are not typical modes of analysis to be utilized in resolving most if not all contract disputes, and they should not be used, as the majority uses them here, as the starting point for analyzing any such dispute.

I am authorized to say that Justice ROVIRA joins in this special concurrence.